Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with modifications the Opinion and Award of the Deputy Commissioner.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Order as:
 STIPULATIONS
1. At the time of the alleged contracting of and disability from the alleged occupational disease, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act and the employer-employee relationship existed between plaintiff and defendant.
2. Defendant is self-insured. At the time in question in this case, Kemper was the risk manager.
3. Plaintiffs average weekly wage may be determined by the Commission from an accurate wage chart prepared by defendant.
4. Commission Form 18, marked as Plaintiffs Exhibit 1, is admitted into evidence as a document filed with the Commission on the date reflected by the date stamp shown on the copy contained in the Commissions file. This form is admitted into evidence for the purpose of showing it was filed with the Commission and not as evidence of the matters stated therein.
5. At all times relevant to this claim, the employer-employee relationship existed between plaintiff and defendant.
6. Plaintiffs average weekly wage was $673. 44.
***********
Based upon all of the competent evidence adduced at the hearing, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was employed by defendant from 26 August 1974 through July 1993. Plaintiff worked on the first floor in DTFY as a doffer for eighteen and one half years. Defendants workers and supervisors confirmed, and the Full Commission finds as a fact, that these jobs required the employee to squat or crouch approximately 32 times per shift, or every fifteen minutes, and to hold that position for between 30 to 60 seconds.
2. In May and July 1980, plaintiff had trouble with his right knee, including locking. In August 1980, plaintiff was in an automobile accident and continued to have problems with his right knee throughout September 1980. In October, he had surgery on his right knee for torn cartilage.
3. In April 1981, plaintiff stepped in a hole and twisted his right knee, again causing problems. In October 1981, he injured his knee walking down some steps.
4. In 1983, DTFY first floor became automated. Doffers no longer had to use a doffing saber to remove the filled tubes from the machines.
5. On 27 March 1984, plaintiff reported he fell while playing racquet ball causing his left knee to lock, stiffen and swell. He experienced left knee pain off and on throughout the late 1980s.
6. Also, in the late 1980s, plaintiff began to experience problems with his left hand going numb. Although plaintiff contends that his hand problems began in the 1980s, he admits he did not report the problems to any medical doctor until 1992.
7. While working in the spinning operator position, plaintiff used a number of hand tools, including a 12 to 14 pound doffing gun which held thread lines and required pressing a plunger button. Light metal rods with wooden handles where used to control the placement of the threads onto the wind-up. These tools were used approximately eight times per hour. Plaintiff also used a string-up gun, which used air to move threads or material while doffing and required plaintiff to hit a short lever to control the air. This was done approximately three times per hour. In the early 1980s, plaintiff used a doffing saber, a handle with a long rod that was inserted into a tube to pull finished product off the windups and then placed on a buggy. This process was replaced by automation in approximately 1983, which plaintiff controlled by pushing a button.
8. In 1991, plaintiff was selected for a QCR, quality control, position. This job did not require frequent bending, stooping or kneeling. Loretta Butts, plaintiffs supervisor for a number of years in DTFY, never heard plaintiff complain about his hands or wrists.
9. In September 1992, plaintiff reported to Dr. Charles Classen, an orthopedist, that he had experienced pain in his knees for over four months. At no time did plaintiff indicate that he had injured his knees in any specific event. Arthroscopic surgery performed by Dr. Charles Classen revealed a flap tear of the medical femoral condyle and small tear of the lateral meniscus in the left knee. By 6 October 1992, plaintiff reported he had no symptoms. Plaintiff was discharged from Dr. Classens care on 6 October 1992, following his knee surgery.
10. It was not until over two months later in December 1992, when plaintiff returned to Dr. Classen that he attempted to establish a relationship between his employment with DuPont and his knee problems.
11. At the 17 December 1992 visit, plaintiff complained of right hand pain which he indicated had been present for several years, even though he had seen Dr. Classen numerous times for his knees. Plaintiff did not relate this pain to his job.
12. After his knee surgery in 1992, plaintiff was able to do his regular DTFY job. In December 1992, plaintiff claimed his knee popped and he never returned to DTFY.
13. Dr. Classen performed carpal tunnel release on plaintiffs right hand on 28 January 1993.
14. On 8 February 1993, plaintiff was placed on light duty and was able to perform some work in maintenance rebuilding wind-ups. However, it became necessary for DuPont to find a permanent assignment for plaintiff. In May 1993, DuPont tried to place plaintiff in the baler assignment in staple finishing. He never attempted to perform the work before telling DuPont that he could not do the work. In June 1993, plaintiff ultimately agreed to try the baler job but fell within a week of being in that assignment. Thereafter, plaintiff returned to DTFY. He then was assigned temporarily to the maintenance shop rebuilding windups.
15. There were no other jobs at the plant plaintiff could perform based on his education and service. DuPont offered to provide plaintiff additional education; however, plaintiff chose not to proceed with the education. DuPont was unable to find work which plaintiff would perform, despite the fact that the jobs offered fit within plaintiffs work restrictions. In July 1993, DuPont terminated plaintiff.
16. Dr. Classen performed release surgery on plaintiffs left hand on 23 August 1993. Plaintiff was released from Dr. Classens care for his carpal tunnel on 8 September 1993. When asked whether plaintiffs job was the cause of his carpal tunnel syndrome, Dr. Classen was of the opinion that the job "could have or might have caused the condition. When asked whether the job placed plaintiff at a greater risk than that of the general public in developing carpal tunnel syndrome, Dr. Classen did not answer the question, but stated only "[i]f you repetitively use your wrist and hands over a long period of time, youre more likely to develop the carpel tunnel syndrome. He did not express an opinion as to whether plaintiffs job required prolonged repetitive use of the hands or wrist.
17. On 15 March 1994, Dr. Classen restricted plaintiff to no more than four hours of prolonged standing, stooping or squatting because of prior torn cartilages in his knees. Dr. Classen gave plaintiff a seven percent permanent partial disability of the left lower extremity because of the torn medial meniscus and flap tear on the articular cartilage of the medial femoral condyle. Plaintiffs impairment rating to his knee was based solely on the fact that he had had surgery. He also gave plaintiff a five percent impairment rating of the left arm and right arm.
18. Dr. Classen believed that a person with plaintiffs history, including an automobile accident with resulting arthroscopic surgery and racquetball injuries to his left knee, would be more likely to have resulting knee problems regardless of their employment.
19. Loretta Butts, plaintiffs supervisor since 1989, testified that plaintiff had multiple health problems over the years. He reported to Ms. Butts that none of them were work related.
20. Plaintiff has been able to continue throughout the 1980s to bowl, play racquetball and water ski. During all of his life and specifically throughout his employment with DuPont and since, he has continued to fish and perform woodworking hobbies, including casting, operating a reel, tying lines, sawing, sanding, hammering and painting. Prior to his surgery, plaintiff had occasional pain in his hands when he bowled and when he was sanding, hammering, sawing, painting or fishing.
21. On 1 April 1996, Dr. George Edwards, Sr., an orthopedic surgeon, examined and evaluated plaintiff. After noting plaintiffs history of knee surgery, Dr. Edwards diagnosed him as having some crepitation in both knees, with good stability. Plaintiff walks without a limp and experienced no pain to palpation of either knee. He stated his opinion that plaintiff had reached maximum medical improvement and rated him with a 15 percent permanent partial disability to the left leg, and ten percent to the right leg. He noted only that plaintiff appeared recovered from his carpal tunnel syndrome, and offered no permanent partial disability rating to plaintiffs arms.
22. Dr. Edwards concluded that prolonged squatting was definitely detrimental to plaintiffs knees and aggravated his pre-existing problems. He further stated that plaintiffs job put him at an increased risk over that of the general public for developing knee problems. However, Dr. Edwards defined prolonged squatting as maintaining a full squat position for at least ten minutes. Plaintiff never told Dr. Edwards how long he squatted at his job, and Dr. Edwards never went to the plant to view plaintiffs job. His opinion relied upon viewing edited tapes of the position which focused on squatting. Further, Dr. Edwards acknowledged that racquetball is a sport very tough on the knees, that bowling could have an effect on a preexisting knee condition, as could being overweight. Dr. Kasselt also thought that racquetball and bowling, hobbies performed by plaintiff, could cause a meniscus tear. The less an individual plays racquetball, the more likely the individual would sustain a knee injury while playing. For these reasons, Dr. Edwards opinion regarding the increased risk factor in plaintiffs position as it relates to knee damage is given little weight.
23. Dr. Edwards also believed that plaintiffs job was the cause of his carpal tunnel syndrome, and that persons performing the spinning machine operator job were at a greater risk of developing carpal tunnel than the general public. Because Dr. Edwards never viewed plaintiffs job, his opinion regarding the causal connection between plaintiffs work activities and his carpal tunnel syndrome is given little weight.
24. Dr. Maxwell R. Kasselt visited defendants plant and observed persons performing the jobs held by plaintiff. He also reviewed plaintiffs medical records. Dr. Kasselt stated that in general, the doffers position did not place an employee at a greater risk of developing knee problems than that faced by the general public. He noted that squatting is a basic movement which is performed in everyday life. Specifically, he testified that plaintiffs job did not place him at a greater risk than the general public of developing knee problems, and that given plaintiffs pre-existing condition, he would have developed the same problems regardless of his employment. Greater weight is given to the opinion testimony on increased risk of Dr. Kasselt as concerning plaintiffs knee problems compared to that of Dr. Edwards.
25. When asked whether plaintiffs job placed him at an increased risk over that of the general public in developing carpal tunnel syndrome, Dr. Kasselt stated that he would not say that the job caused carpal tunnel syndrome. Rather, he believed that plaintiff was predisposed to develop the condition, and "doubt[ed] very much that many people on that line have carpal tunnel syndrome. Dr. Kasselts opinion regarding the causal connection between plaintiffs job and his carpal tunnel syndrome is given greater weight than that of Dr. Edwards.
26. Nancy Stewart, a rehabilitation counselor and vocational rehabilitation expert, spent approximately twelve hours at the plant site observing the performance of jobs and interviewing workers and section leaders. In the first floor ETF job, she observed frequent stooping, defined as "bending at the waist to reach downward and forward, occasional kneeling, and only negligible crouching, defined as "bending the legs and knees to work at a low position close to the floor. In the first floor DTFY job, she again observed frequent stooping and occasional kneeling, and crouching rose to the category of occasional. Finally, in both the second floor ETF and DTFY jobs, she found kneeling and stooping to be occasional, and crouching to be negligible. With the exception of the frequent stooping requirement in the first floor jobs, Ms. Stewart found that the movements required by plaintiffs jobs was within the range of the majority category of jobs in the general population.
27. Before the hearing before the Deputy Commissioner and since he left DuPont, plaintiff had not applied for any other jobs.
28. Plaintiffs job as a doffer did not place him at an increased risk of sustaining a tear or anterior cruciate ligament problems. The meniscus tear would have happened at an unidentifiable time. Plaintiff was predisposed to knee problems which would have developed with any job.
29. Plaintiffs job did not place him at an increased risk for developing carpal tunnel syndrome.
30. No future medical monitoring will be necessary for plaintiffs conditions.
31. Plaintiff has not been employed from July 1993 up until the time of the hearing before the Deputy Commissioner, and has made no effort to find a job.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiffs tears of the articular cartilage and meniscus did not result from an injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat.97-2(6).
2. Plaintiffs complaints of carpal tunnel syndrome did not result from an injury by accident arising out of and in the course of plaintiffs employment with defendant-employer. N.C. Gen. Stat.97-2(6).
3. In order to establish the existence of an occupational disease compensable under N.C. Gen. Stat. 97-53(13), the disease must be: (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the employment. Rutledge v. Tultex Co., 308 N.C. 85, 93,301 S.E.2d 359, 365 (1983).
4. The greater weight of the medical evidence in this case, coupled with the testimony of Nancy Stewart and co-employees of plaintiff, fail to establish that plaintiffs job placed him at a increased risk over that faced by the general public in developing either the conditions present in his knees, or carpal tunnel syndrome. Accordingly, plaintiff has not suffered from an occupational disease as defined by the Act. N.C. Gen. Stat. 97-53.
5. Plaintiff is entitled to no compensation under the provisions of the North Carolina Workers Compensation Act. N.C. Gen. Stat.97-2(6), 97-53(13).
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under the law, plaintiffs claim must be, and the same, DENIED.
2. Each side shall bear its own costs.
This the day of June, 2000.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/_______________ RENÉE C. RIGGSBEE COMMISSIONER